W. D. FARMER v. WILMINGTON & WELDON RAILROAD
COMPANY.

*Railroads—Contributory Negligence—Proximate and remote
cause of injury—Common of Pasture.*

1. Where an injury results from negligence and the act of the plaintiff is
directly connected and concurrent with that of the defendant, the plain-
tiff's negligence is the proximate cause of the injury and will bar his
recovery in a suit for damages; but where the negligent act precedes that
of the defendant, it is the remote cause, and the defendant will be liable
if the injury could have been avoided by the exercise of reasonable care.

2. Plaintiff's mule was killed by defendant's train; *Held,* that even if the
plaintiff was guilty of contributory negligence in turning the mule out of
his enclosure, he is entitled to recover damages if defendant could have
prevented the accident. But the plaintiff had the right to turn out the
mule, and the act can in no sense be considered as contributory negligence.

3. The law in reference to "common of pasture" touched upon and discussed
by ASHE, J.

(*Burgwyn* v. *Whitfield,* 81 N. C., 261; *Gunter* v. *Wicker,* 85 N. C., 310, and case
cited, approved).

CIVIL ACTION tried at Fall Term, 1882, of WILSON Superior
Court, before *MacRae, J.*

Plaintiff claims damages occasioned by the running over and
killing his mule by defendant's train.

The following issues were submitted to the jury:

1. Did defendant negligently kill the plaintiff's mule?

2. What was the value of the mule?

The jury responded in the negative to the first issue. Judg-
ment against the plaintiff for costs.

On the trial, the plaintiff testified in his own behalf that he
was the owner of a mule which was knocked off the track and
killed by defendant's train on the 16th of June, 1880; that he
lived on the east side of the road, about fifty yards from the
track, his horse lot being on the same side and about the same

distance from the track, and his well about same distance on the west side; there is a public road leading across the track, over which his stock, when turned out of the stables, were in the habit of going to the well for water; there is also a field on either side of the track; the fence on the west side is about seventy yards from the track, and that on east side about sixty, the former extending a mile, the latter only about seventy yards, not as far as the point where the mule was killed. When the witness' attention was first directed to the mule, he was grazing on the road-side about sixty feet from the track, and when the whistle of defendant's locomotive commenced blowing, the mule became frightened and ran along the side of the track in a little foot-path, and was struck, when attempting to cross, about one hundred and fifty yards from the crossing, on the south side of which is a deep "cut" extending a hundred yards or more. At the crossing the road is level, up grade going north to the crossing, down grade after passing it, straight track, one on the locomotive could see a mule five hundred yards on the track, the whistle was blown considerably one hundred and fifty yards before the train struck the mule, when the witness noticed that the train "jarred back," and did not think it slacked its speed.

The engineer (McSween) testified that the train was running at the rate of twenty-eight or thirty miles an hour, and was supplied with all necessary machinery and air-brakes of the most approved kind. When he got out of the "cut" (he could see nothing before he got out) he saw the mule grazing on the side of the road. He stood on the right side of the engine, the mule was on the same of the road, about two hundred yards ahead, in the jam of the fence, about sixty-five feet from the track, he blew the cattle alarm a great many times, and applied the brakes which were attached to each coach in good condition, and worked from the engine, the mule ran about fifty yards on the right side of the track, and was seen by the witness about two hundred yards ahead, coming towards the track, and as soon as he discovered it, he put on the brakes, and stopped the train as the

"sleeper," the last car, reached the place where the mule was struck. He stopped a second or two only, used all the preventives he could, had been an engineer for thirteen years, and on defendant's road four years, the train running as it was could not be stopped in less than two hundred and fifty yards.

A passenger on the train (Carraway) was next examined as a witness for defendant. He stated that he observed an unusual amount of blowing, and that the train "slowed down," started off again with whistle blowing, felt a jar, looked out of the window and saw the mule fall, the train came near enough to a stop for the witness to have got off, the whistle blew several times on the other side of the crossing, but got pretty well under way, at the rate of seven or eight miles an hour, when the mule was struck, the jarring may have been caused by the application of the brakes.

Horn, another witness for the defendant, was on the same train, heard the cattle alarm blown, felt the brakes go down, looked out of the window and saw the mule fall.

Knight, the master of transportation on defendant's road, stated that the train was well supplied with brakes, the schedule time was about thirty miles an hour, including stoppages, but the running between depots was much faster. He also testified to the good character of the engineer.

George V. Strong, an attorney, who examined one Jesse Dancy, a witness for plaintiff on a former trial, and took notes of his testimony, stated his testimony to be, that the mule was feeding in the cart-path and lock of the fence, the whistle blew and the mule ran down a foot-path forty or fifty yards, when it first blew the train was two or three hundred yards off, and a hundred and fifty or two hundred yards from the crossing, and was twenty-five or thirty yards from the mule when it blew the last time, the path was thirty feet from the centre of the track, the train did not slack up before it struck the mule, but slacked a little afterwards; on cross-examination, stated that the whistle blew at the

crossing, and again when nearly opposite the mule, the train might have slacked some, the mule was gray, and could have been seen a great distance on the track.

Several witnesses testified as to the good character of the plaintiff.

His Honor, among other things, charged the jury, that cattle owners in this state are not bound to keep them in enclosures to prevent trespass upon others, but if the jury are satisfied from the evidence that the plaintiff, knowing the train would pass that point in a short time, turned the mule upon the track of defendant and left it there, and this action of his contributed directly to the injury complained of, the plaintiff would be guilty of contributory negligence and would not be entitled to recover. The plaintiff excepted, and then requested the following instruction: If plaintiff was guilty of negligence in turning his mule out, yet, if defendant by the exercise of proper care could have avoided the injury to the plaintiff's mule, the plaintiff is entitled to recover. This was refused, and the plaintiff excepted and appealed from the judgment.

*Messrs. Strong & Smedes,* for plaintiff.
No counsel for defendant.

ASHE, J. We are of the opinion there is error in the instruction given to the jury, and in the refusal to give that requested.

By the common law, every person is obliged to confine his animals to his own premises, but in this state the common law has never obtained in this respect. In the early settlement of the country, when the population was sparse and there were vast tracts of unenclosed lands, cattle were permitted to run upon what was called the "range"; and although strictly unlawful when they grazed upon the unenclosed lands of any one besides their owner, it was a trespass, winked at by the law. By a kind of tacit consent, each farmer was recognized as having a "*common de vicinage*" upon the unenclosed lands of his neighbor. The

usage so long prevailed that it came to be considered as a right; and as cattle in the "range" were likely to break into and trespass upon enclosed lands, the legislature passed the law in regard to fences, making it indictable for any one to have about a cultivated field, in crop time, a fence less than five feet high; and again providing that no person should recover any damages done by horses or other stock upon his enclosed grounds, unless he could make it appear that he had a good and sufficient fence. The object of which legislation seems to have been, to fence out one's neighbor's cattle, rather than to fence one's own in, thereby recognizing the right to turn one's cattle to feed upon the "range." *Burgwyn* v. *Whitfield*, 81 N. C., 261.

If, then, it is no trespass for cattle to wander upon unenclosed lands, and persons whose cattle stray upon an unfenced railroad track are not thereby placed in the position of wrong-doers, it follows that railway companies are liable for the ordinary negligence of their servants toward such animals. In Mississippi, where the *quasi "common de vicinage"* prevails as in this state, the doctrine is thus announced: "Persons living contiguous to railroads have the same right as others, in more remote localities, to turn their cattle upon the range; but they assume the risk of their greater exposure to danger. The cattle are liable to go upon the road: the company cannot detain them damage feasant, any more than any other land-owner; nor can they treat them as unlawfully there, and therefore relax their care and efforts to avoid their destruction. The only justification of the company for injury to them is, that in the prosecution of their ordinary and lawful business, the act could not have been avoided by the use of such care, prudence, and skill, as a discreet man would put forth to prevent or avoid it." *R. R. Co.* v. *Field*, 46 Miss., 573.

If, therefore, the plaintiff turned his mule out of his enclosure, as he had the right to do, the act could in no sense be considered as contributory negligence, and it was error in the judge to charge the jury that "if you are satisfied by the evidence that the plain-

. tiff, knowing the train would pass that point in a short time, turned his mule upon the track of the defendant and left it there, and this action of his contributed directly to the injury complained of, the plaintiff would be guilty of contributory negligence, and would not be entitled to recover." We presume what His Honor meant by *turning the mule upon the track,* was, the turning it out near the track, for there was no proof it was turned by plaintiff upon the track.

But conceding that negligence was imputable to the plaintiff in turning his mule out of his lot, as described by the witnesses, still it was the duty of the defendant to exercise proper care to avoid the injury; for it has been held by this court, that "notwithstanding the previous negligence of the plaintiff, if at any time when the injury was committed it might have been avoided by the exercise of reasonable care and prudence on the part of the defendant, an action will lie for damages." *Gunter* v. *Wicker,* 85 N. C., 310. The instruction asked by the plaintiff and refused by the court, was almost in the identical language of this decision, and when the court declined to give it, the jury may possibly have been misled by the inference, reasonably to be drawn by the refusal, that the court was of opinion the converse of the proposition was the law: in other words, that if the plaintiff contributed by his unlawful act to the injury, the defendant would be excused from the exercise of that reasonable care and prudence which the law, under other circumstances, requires at the hands of a railroad company and its servants.

In *Davies* v. *Mann,* 10 M. & W. (Exc.), 546, it is held that the general rule of law respecting negligence is, "that although there may have been negligence on the part of the plaintiff, yet, unless he might, by the exercise of ordinary care, have avoided the consequence of the defendant's negligence, he is entitled to recover. Therefore, where the defendant negligently drove his horses and wagon against, and killed an ass which had been left in the highway fettered in the forefeet, and thus unable to get out of the way of defendant's wagon, which was going at a

72

smartish pace along the road, it was held that the jury were properly directed that although it was an illegal act on the part of the plaintiff, so to put the animal in the highway, the plaintiff was entitled to recover."

Whether the act of the plaintiff in turning out his mule constituted contributory negligence, depends upon the question whether the act of the plaintiff was a proximate or a remote cause. If the act is directly connected, so as to be concurrent with that of the defendant, then his negligence is proximate and will bar his recovery; but where the negligent act of the plaintiff precedes in point of time that of the defendant, then it is held to be a remote cause of the injury and will not bar a recovery, if the injury could have been prevented by the exercise of reasonable care and prudence on the part of the defendant. Thompson on Negligence, 1157, note 8; *Gunter* v. *Wicker*, *supra; Doggett* v. *R. R. Co.*, 78 N. C., 305; *Roberts* v. *R. R. Co., ante,* 560. Here, the act of turning out the mule, conceding it to have been unlawful, was not a proximate cause of the injury.

We do not mean to intimate an opinion as to the question whether the defendant had used the care and prudence required by the law to avoid the injury, but only that the plaintiff was entitled, as matter of law, to the instruction asked, and that the refusal to give it may have had an improper influence on the minds of the jury, and that there was error in the charge given.

Error.                                    *Venire de novo.*